**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2108-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ORDALE R. TELFAIR,
a/k/a ORDALE TELFAIR,
ODELL TELFAIR,
ODELL R. TELFAIR,
ORDDALE R. TELFAIR,
ORDALE R. BLITZ,
ORDALE BLITZ, and
BLITZ,

    Defendant-Appellant.

_____

Argued February 6, 2024 – Decided February 23, 2024

Before Judges Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 19-09-0335.

Lauren Stephanie Michaels, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Lauren

Stephanie Michaels, and James K. Smith, Jr., Assistant Deputy Public Defender, of counsel and on the briefs).

Amanda Gerilyn Schwartz, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Adam David Klein, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Ordale R. Telfair appeals from a September 9, 2021 judgment of conviction entered after a jury found him guilty of murder, N.J.S.A. 2C:11-3(a)(1) and (2), possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), and unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and the consecutive sentences imposed. We affirm in part, reverse in part, and remand for the limited purpose of allowing the trial judge to provide "an explanation for the overall fairness of [the] sentence" as required by State v. Torres, 246 N.J. 246, 272 (2021).

I.

We summarize the pertinent facts adduced at the jury trial relevant to the claims on appeal. On May 23, 2019, around 8:22 p.m., defendant fatally shot Tayshon "Sapp" Hayward outside of a Penns Grove apartment complex. The shooting transpired after Cleon Burden instigated an altercation against Keyshon Davis, who Burden believed stole money from his wife's vehicle. Burden and

A-2108-21

Davis had fought earlier in the day requiring police intervention. Neither Hayward nor defendant was involved in the earlier incident.

On the night in question, Burden went to the apartment complex to visit a cousin and saw Davis there with other men. Feeling outnumbered, Burden left and enlisted his cousin and a friend to return with him to confront Davis. Burden's wife drove the men to the apartment complex. Burden's sister arrived separately in her vehicle. Burden approached Davis and asked him to fight, but Davis declined. During the exchange, Hayward, who was with Davis, walked away. Defendant ran after Hayward and fatally shot him in the face.

At trial, Hayward's girlfriend, Porsha Williams, testified she had been dating and living with Hayward for several months. She had joined him at the apartment complex on the night in question. Williams witnessed a "dark-skinned guy with like a mark underneath his eye [and] a bald head" follow Hayward and shoot at him twice with a handgun. One shot missed, and the other struck Hayward underneath his eye. She relayed hearing "boots hit the ground from [the shooter] jumping out [of] the truck." After shooting Hayward, the man "ran and jumped back inside the truck," and it "pulled off."

During Williams's testimony, the prosecutor, without providing defense counsel notice, attempted to conduct an in-court identification of defendant.

3

Defense counsel had filed multiple motions to suppress witnesses' "[i]n and [o]ut of" court identifications, which were withdrawn. The identification exchange was as follows:

Q. This person that shot [Hayward,] did you ever see him before?

A. No.

Q. No. Do you see him in the courtroom today?

A. No.

Q. You don't see him in the court room today, this person?

A. Yes.

THE COURT: Asked and answered . . .

[Defense Counsel]: Excuse me-

THE COURT: I said asked and answered.

[Prosecutor]: Judge, I thought she said yes.

THE WITNESS: I said yes.

. . . .

Q. You do. Can you tell us where he's seated?

A. Right there.

A-2108-21

Defense counsel requested a sidebar and objected. He moved for "the answer [to] be stricken" because Williams had previously "d[one] an array" where "she picked a different person," and argued a trial could not "be more of a suggestive atmosphere to do an identification." The judge inquired, "when you say you want me to strike the answer, do you want me to strike both answers? Because if I say that answer is stricken, will the jury know which one I mean[?]" Defense counsel responded that he "assume[d] it would have to be . . . both answers," though he clarified he was most "concerned about . . . the in-court identification." The judge advised, "I'm going to say to the jury that the last answer of the witness is stricken." Defense counsel requested no further charge. The judge then instructed the jury: "the last answer of the witness is stricken from the record and the jury will disregard it."

The prosecutor then questioned Williams regarding her out-of-court identification from a photo array provided by the police of the person she believed shot Hayward. Williams testified she was "[seventy-five] percent sure" of her identification.

On cross-examination, defense counsel questioned Williams on her identification from the photo array. Claiming she "was still . . . kind of in shock" and had not gotten any sleep, when asked whether the photograph she chose

"was [of] the person who shot [Hayward]," Porsha responded "[n]o." The prosecutor later introduced the video of Porsha's photo array through Detective Salvatore Giuliano's testimony.

The State thereafter called Burden, who testified that after he asked Davis to fight, a man—later identified as Hayward—walked away stating "he was going to get a gun." Burden relayed defendant "ran after the . . . guy" who had walked away, he heard gun shots, and defendant ran back into the car with Burden. In the car, defendant stated he thought "he hit him in the head or . . . face." Burden had known defendant since childhood and identified him in court.

Robinson, a woman defendant had recently begun dating, testified that on the night of the shooting, defendant admitted to shooting Hayward "in the face." She testified she was scared after learning that he had killed Hayward.

During summations, a central focus was the credibility of the eyewitnesses at the shooting and the identification of defendant. Defense counsel argued the importance of photo array identification guidelines, which police had followed, and highlighted that Williams had not identified defendant as the shooter. Defense counsel further argued:

> Now on May 24, 2019[,] . . . Williams is brought into the police station with the purpose – now this is within [twenty-three] hours of her having seen – is brought into the police station and they do a

6

photographic array procedure with her. She's there importantly because she saw the crime happen. And she even said when she testified . . . that the person who did the shooting [went] . . . by her. She saw . . . the person commit the crime. And the person went . . . by her, but it was like at [an] angle. But the bottom line is she was there to make the identification because obviously the police thought she could make an identification having been there and seen the person who did it.

. . . .

So, all you have now in this case right now is you have . . . Williams who identified somebody else as being the shooter was sure that it wasn't [defendant].

Defense counsel also commented to the jury regarding the veracity and motive of different witnesses, positing for consideration: whether all of Williams's testimony "was truthful"; that Robinson "ha[d] her own reasons for not being truthful"; and whether Burden was "trying to get out of trouble . . . himself."

The prosecutor, in summation, classified the witnesses at the shooting into two groups: "people who knew and loved . . . Hayward when he died on May 23, 2019[,] and people who knew and cared about" defendant. The prosecutor concluded his summation as follows:

[I]n order to find [defendant] innocent[,] you have to completely discount the testimony of . . . Hayward's girlfriend . . . Williams. You have to completely discount the testimony of [Hayward]'s friend Jasmine

7

Bell. You have to completely discount that for some reason . . . [defendant's] long-time friend [(Burden)] who knows his nickname, who knows his mom and . . . lie[d] to the police and . . . lie[d] again on the stand. You have to [for] some reason believe and discount the testimony of [defendant's] lover on the day of May 23, 2019[,] that she would for some reason lie to the police and then come to court and lie today on the stand. In order for you to find [defendant] innocent[,] you have to discount all that testimony.

Defendant did not object to the prosecutor's closing statement.

The judge instructed the jury that "[r]egardless of what counsel and I may have said recalling the evidence in this case, it is your recollection of the evidence that should guide you as judges of the facts." She further instructed, "[a]rguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence." Regarding any testimony stricken from the record, the judge charged, "[a]ny testimony that I may have had occasion to strike is not evidence and shall not enter in your final deliberations. It must be disregarded by you." She further instructed that "even though you may remember the testimony you are not to use it in your discussions or deliberations." Defendant did not object to the final jury charge.

On September 9, 2021, the jury found defendant guilty of purposeful and/or knowing murder, possession of a handgun with an unlawful purpose, and unlawful possession of a handgun. The State moved for an extended sentence

8

based on defendant's eight prior convictions, including a prior firearms conviction under N.J.S.A. 2C:12-1(b)(2). After hearing argument, the judge granted the State's motion providing "the extended term range of sentencing for the crime of murder is [thirty-five] years to life and the statute requires that [thirty-five years] be served without parole." The impact statements submitted from Hayward's mother and brother were also considered. The judge found no mitigating factors, but found aggravating factors three, N.J.S.A. 2C:44-1(a)(3), "risk that the defendant will commit another offense," six, N.J.S.A. 2C:44-1(a)(6), "extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted," and nine, N.J.S.A. 2C:44-1(a)(9), "need for deterring the defendant and others from violating the law." The judge found the aggravating factors predominated. Defendant was sentenced to a fifty-year prison term for murder, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, to be served consecutively to a ten-year sentence with a five-year period of parole ineligibility for unlawful possession of a firearm.

On appeal, defendant argues:

POINT I

DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR, APPARENTLY WITHOUT

9

ANY NOTICE TO DEFENSE COUNSEL, ASKED PORSHA WILLIAMS TO IDENTIFY DEFENDANT IN COURT, EVEN THOUGH SHE HAD SELECTED ANOTHER MAN'S PHOTO IN A PRETRIAL PHOTO LINEUP. THE ERROR WAS EXACERBATED BY THE TRIAL COURT'S FAILURE TO GIVE A MEANINGFUL CORRECTIVE INSTRUCTION.

A. Where An Eyewitness Has Failed To Identify Defendant In A Pretrial Procedure, There Should Be A Pretrial Hearing Before The Prosecutor Is Allowed To Ask That Witness To Identify Defendant In Court.

B. The Prejudice To Defendant Was Not Rectified By The Trial Court's One-Sentence Statement That "The Last Answer Of The Witness Is Stricken From The Record And The Jury Will Disregard It." The Judge Should Have Instructed The Jury That Porsha Williams'[s] In-Court Identification Was Unreliable And Could Not Be Considered For Any Purpose.

POINT II

DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S COMMENTS IN SUMMATION THAT THE JURY WOULD HAVE TO "COMPLETELY DISCOUNT" THE TESTIMONY OF SEVERAL STATE'S WITNESSES IN ORDER TO RETURN A NOT GUILTY VERDICT.

POINT III

IT WAS IMPROPER TO IMPOSE A CONSECUTIVE SENTENCE FOR POSSESSION OF A FIREARM

10

WITHOUT ANY ANALYSIS OF THE YARBOUGH[1] FACTORS. MOREOVER, CONCURRENT SENTENCES WERE CLEARLY WARRANTED BECAUSE THERE WAS NO EVIDENCE THAT DEFENDANT POSSESSED THE FIREARM OTHER THAN DURING THE SHOOTING.

II.

Our Supreme Court has elucidated that trial courts confronted with a first-time in-court identification must "take steps to guard against practices that pose serious due process concerns—especially inside a court of law in front of a jury." State v. Watson, 254 N.J. 558, 586 (2023). "By conducting a suggestive identification procedure in a courtroom, the State may implicate due process concerns and deprive defendants of their due process rights in a way that neither cross-examination nor jury instructions can adequately address." Ibid. The Supreme Court prospectively held that "the State must file a motion in limine if it intends to conduct a first-time in-court identification procedure" providing defendants with "advance notice and an opportunity to challenge in-court identification evidence before trial." Id. at 588. "Defendants can then challenge an identification at a pretrial hearing and try to prevent the jury from learning

---

[1] State v. Yarbough, 100 N.J. 627 (1985).

about potentially tainted evidence." Id. at 586. Indeed, trial courts are to be vigilant to exclude suggestive first-time in court identifications of a defendant.

Prior to the Supreme Court's decision in Watson, and at the time of this trial, an in-court identification was admissible so long as the suggestive courtroom atmosphere did not "outweigh the reliability of the identification." State v. Clausell, 121 N.J. 298, 328 (1990). Generally, "the ultimate burden remain[ed] on the defendant to prove a very substantial likelihood of irreparable misidentification." State v. Burney, 471 N.J. Super. 297, 327 (App. Div. 2022) (quoting State v. Henderson, 208 N.J. 208, 289 (2011)), rev'd, State v. Burney, 255 N.J. 1 (2023).

We have long recognized "the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial." State v. C.W.H., 465 N.J. Super. 574, 595 (App. Div. 2021) (quoting State v. Vallejo, 198 N.J. 122, 135 (2009)). "Further, '[t]he adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached.'" Id. at 596 (alteration in original) (quoting State v. Winter, 96 N.J. 640, 647 (1984)). "That the jury will follow

12

the instructions given is presumed." State v. Ross, 229 N.J. 389, 415 (2017) (quoting State v. Loftin, 146 N.J. 295, 390 (1996)).

III.

We reject defendant's argument that despite the judge's curative jury charge striking from consideration Williams's unnoticed in-court identification, he was denied a fair trial. "The simple response to defendant's argument is that the judge sustained the objection, struck the testimony, and the jury presumably followed the instruction." State v. Castoran, 325 N.J. Super. 280, 287 (App. Div. 1999); accord State v. Winder, 200 N.J. 231, 256 (2009). Undisputedly, the prosecutor sought to have Williams identify defendant for the first time in court without notice to defense counsel. We recognize, as defendant concedes, that at the time of trial, the Supreme Court had not yet held that a prosecutor was required to give notice to a defendant before asking a witness to make a first-time in-court identification; thus, a pretrial hearing on reliability of the in-court procedure was not required.

Here, when Williams was first asked if she could identify the shooter in the courtroom, she responded "no." The prosecutor again asked, "You don't see him in the courtroom today, this person?" she stated "Yes." The judge then intervened and stated, "Asked and answered," to which the prosecutor

responded, "I thought she had said yes." The witness stated, "I said yes" and the prosecutor asked where he was seated and Williams stated, "Right there," which was immediately followed by a side bar conference, defense counsel's objection, and his request that the identification be stricken.

We are satisfied the judge sufficiently instructed the jury that Williams's last statement identifying defendant was stricken from the record and they were not to consider it. The judge issued the curative instruction immediately after hearing from counsel. We observe that before the judge gave the charge, after she inquired of defense counsel what he was requesting, she advised that she was going to instruct the jury that the "last answer of the witness is stricken," and defense counsel did not object. A judge's "decision to provide a curative instruction and the content of that [instruction] is left to the discretion of the trial judge." State v. McKinney, 223 N.J. 475, 497 (2015). Where defense counsel "d[oes] not object to the jury instruction at trial," we "review[] the charge for plain error." Id. at 494.

Having concluded the charge striking the identification was not in error, we further note that in light of the overwhelming evidence of defendant's guilt, if deficient, it did not have the potential to cause an unjust result. See State v. Cotto, 182 N.J. 316, 327 (2005) ("[T]he strength and quality of the State's

corroborative evidence rendered harmless any deficiency in the instruction [on identification] and precludes a finding of plain error."). In particular, the substantial trial evidence against defendant included the eyewitness testimony of defendant's lifelong friend Burden, the corroborating testimony of Bell, and Robinson's testimony that defendant admitted shooting Hayward in the face. As the identification was immediately stricken, there is no "reasonable doubt as to whether the jury reached a result it otherwise might not have." Watson, 254 N.J. at 590-91.

IV.

Generally, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Patterson, 435 N.J. Super. 498, 508 (App. Div. 2014) (quoting State v. R.B., 183 N.J. 308, 332 (2005)). Prosecutorial misconduct justifies reversal where the misconduct was "so egregious" as to "deprive[] the defendant of a fair trial." State v. Smith, 167 N.J. 158, 181 (2001) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). "In deciding whether prosecutorial conduct deprived a defendant of a fair trial, 'an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v.

<u>Williams</u>, 244 N.J. 592, 608 (2021) (quoting <u>Frost</u>, 158 N.J. at 83). Reversal is appropriate only where the prosecutor's actions are "clearly and unmistakably improper." <u>Patterson</u>, 435 N.J. Super. at 508 (quoting <u>State v. Wakefield</u>, 190 N.J. 397, 437-38 (2007)).

As defendant failed to object to the remarks at the time of trial, we review the prosecutor's comments for plain error. <u>See</u> <u>R.</u> 2:10-2. We observe defense counsel in summation questioned the credibility of the witnesses present at the shooting. He questioned the veracity of Burden's testimony that defendant ran after Hayward, two shots were heard, and that defendant ran back entering the vehicle with Burden before admitting he shot Hayward in the face. Defense counsel further challenged the truthfulness of Robinson and Williams's testimony. The prosecutor's comment "to find [defendant] innocent, you have to completely discount the testimony" of the State's witnesses was followed by a recitation of the testifying witnesses who were present at the shooting and responded to defense counsel's challenges to their credibility. We conclude the prosecutor's remarks were not "'clearly and unmistakably improper,' and [did not] substantially prejudice[] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." <u>Smith</u>, 167 N.J. at 181-82 (quoting <u>State v. Timmendequas</u>, 161 N.J. 515, 575 (1999)). Further, defendant failed to

establish the remarks constituted plain error.  State v. Feal, 194 N.J. 293, 312 (2008).

We are unpersuaded by defendant's arguments that the prosecutor's remarks "flipped the burden of proof" and "undermined the presumption of innocence."  Notably, the prosecutor, immediately prior to the challenged comments in his summation, acknowledged that the State's "standard of proof here is beyond a reasonable doubt."  In reviewing the prosecutor's statements, we evaluate the remarks not in isolation but in the context of the summation as a whole.  State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)).  We conclude the remarks were not "so egregious that [they] deprived the defendant of a fair trial."  State v. McGuire, 419 N.J. Super. 88, 139 (App. Div. 2011) (quoting State v. Ramseur, 106 N.J. 123, 322 (1987)).

Further, in the final jury instruction after summations, the judge charged the jury that a defendant on trial "is presumed to be innocent and unless each and every essential element of an offense charged is proved beyond a reasonable doubt, the defendant must be found not guilty of that charge."  She instructed, "[t]he burden of proving each element of a charge beyond a reasonable doubt rests upon the State and that burden never shifts to the defendant."  We note the

17

challenged remarks are to be "viewed in the context of the entire record." State v. Bey, 129 N.J. 557, 622 (1992). We discern the prosecutor's statements were not "clearly capable of producing an unjust result." R. 2:10-2.

V.

Finally, we address defendant's contention that his sentence should be vacated and remanded for resentencing. Defendant argues because there was no evidence he possessed a handgun prior to or after the murder, and the crimes stem from one incident, the convictions militate to a concurrent sentence. He further argues because the judge failed to provide reasons for imposing the consecutive sentences, a remand is mandated for resentencing. We agree a remand is warranted.

The judge imposed a fifty-year term of imprisonment for murder, subject to NERA, and a ten-year term with a five-year period of parole ineligibility for unlawful possession of a firearm without a permit, to be served consecutively. Regarding the consecutive sentences, the judge's sole statement was, "[t]he sentences will run consecutively to each other, which results in an aggregate sentence of 60 years—47.5 years without parole." The judge did not engage in a complete analysis and address the required findings under the Yarbough factors. Further, the judge did not consider the overall fairness of the sentence

imposed. See Torres, 246 N.J. at 268. The State has acknowledged a remand is required. We add only the following comments.

Applying an abuse of discretion standard, we maintain a limited scope of review when considering sentencing determinations on appeal. See id. at 272. Ordinarily, our review is deferential and we do not "substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). However, our deference applies "only if the trial judge follows the [Criminal] Code and the basic precepts that channel sentencing discretion." State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting State v. Case, 220 N.J. 46, 65 (2014)). In imposing a sentence, the sentencing judge is required to make individualized assessments based on the facts of each case and the aggravating and mitigating sentencing factors. See State v. Jaffe, 220 N.J. 114, 121-22 (2014). The judge must provide its reasons for the sentence and "the factual basis supporting a finding of particular aggravating or mitigating factors affecting [the] sentence." R. 3:21-4(h); see also N.J.S.A. 2C:43-2(e) (requiring sentencing court to state on the record the reasons for imposing a sentence and the "factual basis supporting its findings of particular aggravating or mitigating factors affecting sentence").

When sentencing a defendant for multiple offenses, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a). In Yarbough, 100 N.J. at 642-44, our Supreme Court established criteria that a sentencing judge must consider when deciding whether to impose consecutive sentences. "The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." State v. Cuff, 239 N.J. 321, 348 (2019). A "sentencing court must explain its decision to impose concurrent or consecutive sentences in a given case." Ibid. "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." State v. Miller, 205 N.J. 109, 129 (2011). An explanation of the "overall fairness" is necessary "to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" Torres, 246 N.J. at 272 (alterations in original) (quoting State v. Pierce, 188 N.J. 155, 166–67 (2006)).

Consistent with our Court's holding in Torres, we therefore remand for the judge to provide reasons for the consecutive sentences with "[a]n explicit statement, explaining the overall fairness" of defendant's aggregate sentence. Id. at 268.

Defendant's remaining arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed in part, reversed in part, and remanded for resentencing.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION